No. 5579.

JOHN MAYFIELD v. THE STATE.

1. THEFT—EVIDENCE—CHARGE OF THE COURT.—To develop the *res gestæ*, or to establish by circumstances immediately connected with it the theft charged in the indictment, or to prove the intent with which the accused acted with respect to the property charged in the indictment, it was competent for the State to prove the theft of other like property at the same time and place. But the failure of the charge to properly limit and restrict such proof was material error.

2. PRACTICE.—CHARGES OF THE COURT should be confined to the issues raised by the evidence.

3. CONTINUANCE—NEW TRIAL.—See the statement of the case for evidence set up in an application for continuance, which, considered in connection with the evidence adduced on the trial, entitled the accused to a new trial—the continuance having been refused.

APPEAL from the District Court of San Saba. Tried below before the Hon. A. W. Moursund.

The conviction in this case was for the theft of a mare, the property of J. B. Fondren, and the penalty assessed against appellant was a term of seven years in the penitentiary.

J. B. Fondren was the first witness for the State. He testified, in substance, that he lived in San Saba county, about eight miles west of the town of the same name. In September or October, 1886, the witness lost a large bay mare, about sixteen and a half hands high, and in what was known as the cow head brand. She was taken from a small pasture of twelve or fifteen acres, which was enclosed by a fence made partly of wire, partly of stone and partly of brush. It was a stock proof fence. The gate was on the north side of the pasture. When he missed his mare witness examined the fence, and found it down in one place. He was satisfied that it was taken down by some one, as

the brush was laid evenly aside on the inside. At the place where the fence was down the witness found the tracks of three horses, and became satisfied that the larger of the tracks were those of his mare. The tracks led off in a westerly direction, and were followed by witness for a mile or more. The mare had been running in the pasture about two months. Late in February, or early in March, 1887, the witness found his mare in Mr. Ogden's pasture, in Crockett county, Texas, about one hundred miles from San Saba county. She was in possession of Mr. Meyer, who claimed her. Witness made two trips before he got her back. The cow head brand was canceled and she was then in the KP brand, which belonged to Meyer. The witness recovered at the same time from Meyer a small brown mare branded KT, which animal he sent by F. Ellis to Mr. Taylor in San Saba county. Witness proved those two mares and four or five others away from Meyer, before Justice Flutsch, of Menard county. Witness searched his range for his mare before he went to Crockett county. The animal's former range was in Concho county. The cow head brand was of record in McCulloch county. The defendant lived on Brady creek, between five and seven miles west from witness's house. The mare was taken from the witness's pasture without his knowledge or consent.

T. A. Gay was the next witness for the State. He testified that he was the district clerk of Menard county, and, at the time of this trial was serving out his second term. In January, 1887, Mr. Jeff. Cravey and another man, whom the witness recognizes as the defendant, came into the witness's office and got him to write a bill of sale conveying six or seven head of horses. The witness did not see the horses, nor did he remember their brands as they were reported to him. It was barely possible that the witness could be mistaken that the defendant and Cravey's companion were one and the same. He saw the man but twenty or thirty minutes, but was satisfied that that man was the defendant. Cravey said that he was the son of Sam Cravey, who used to live at ——. In signing the bill of sale, the defendant signed another name than Mayfield, but witness could not recall it. This transation occurred about eight o'clock in the morning. Witness did not know which way Cravey and defendant went on leaving his office. During the day the witness learned that a bunch of twenty-five or thirty head of horses were driven through town on the night or the second night before. After the defendant executed the bill of sale and delivered it to Cravey,

witness asked Cravey if he wanted it recorded. Cravey replied that he did not. He then took the bill of sale and went off with the defendant.

Deputy Sheriff McConnell, of Menard county, Texas, testified, for the State, that about thirty minutes after dark, one day in January, 1887, he saw a bunch of twenty-five or thirty head of horses driven through the town of Menardville, by two men whom he did not know. He could not recognize in defendant or Jeff Cravey either of those two men. They were traveling the Mason road, driving the horses at a moderate gait. Witness did not know where the men or horses stopped that night. The San Saba road joined the Menard and Mason road about five miles east of Menardville. Witness went with Fondren to receive some horses said to have been stolen. They were found in Baugh's pasture, across the county line in Crockett county. The horses were claimed by Fondren for himself and other parties. Among the animals recovered and taken away by Mr. Fondren was a large bay mare, branded with a cow head and the letters KP, a mare branded KT, and some horses branded SU, in all about seven head.

Mr. Meyer testified that in January, 1887, Jeff Cravey and a man whom the witness now recognized as the defendant, came to the pen of witness's father in McKavitt, having in their possession a bunch of twenty-five or thirty head of horses. Some of the horses were branded SU, some EF, and some SC. One mare was branded with a cow's head, and another with the letters KT. The animals were penned and sold by Jeff Cravey. Defendant helped Cravey with the horses. Both helped throw the horses down, and to brand them in the brand of witness's father. Witness understood that the defendant's name was Melton. Witness could not, however, remember that he heard Cravey call the defendant Melton, nor could he remember hearing the name Melton called in the defendant's presence, nor could he remember that defendant, at any time in his presence, answered to the name of Melton. The horses, when sold to witness's father, were held in an open and public place. Cravey executed a bill of sale to witness's father, covering the horses sold. Seven head of the horses sold by Cravey to witness's father were proved away from him by Mr. Fondren.

John Flutsch was the next witness for the State. He testified, in substance, that he he had been a resident of Fort McKavitt for twenty years. He knew Jeff Cravey, but was unable to

identify the defendant as a man he had ever seen before. In January, 1887, Jeff Cravey and another man drove a bunch of twenty-five or thirty head of horses to McKavitt, and put them in the pen near F. Meyer's store. Witness looked at those horses, but did not examine the brands. Witness understood from some source at the time that the man with Jeff Cravey was named Melton. Witness proved up a bill of sale executed by Jeff Cravey to F. Meyer, conveying ten head of horses. In February or March, Mr. Fondren came to McKavitt and proved away six or seven head of those horses. He proved them before the witness as justice of the peace. Witness saw the horses taken by Fondren, and examined the brands. Fondren got a mare in the cow head brand, one in the KT brand, and other animals branded SU. While the witness could not swear positively to the identity of the defendant, he believed him to be the man called Melton, who was with Cravey.

James Cravey, a brother of Jeff Cravey, who was jointly indicted with this defendant, testified, for the State, that defendant lived with his brother during October, November and December, 1886, and January, 1887, and worked for him as a hired hand. Witness knew that in January, 1887, Jeff Cravey, having defendant in his employ, took a drove of horses to McKavitt to pay him on a debt due by his father's estate. That drove did not include the animal described in the indictment when Jeff Cravey started with it to McKavitt. Jeff Cravey owned the EF and SU brands of horses, and witness's mother owned the SC brand, but Jeff Cravey was managing it for her. Defendant could not write; at least he claimed to be unable to write, and, to the knowledge of witness, got other parties to write his letters.

Tap Duncan, Jeff Cravey's brother-in-law, was the next witness for the State. He testified that he was present when Cravey and defendant (defendant as Cravey's employe) started to McKavitt with the drove of horses. The drove did not then contain the animal described in the indictment.

Mr. Taylor testified that he owned the little brown mare branded KT, which was taken from his possession without his consent, and recovered for him by Mr. Fondren.

The application for continuance set up that the defendant expected to prove by one of the absent witnesses that he could not write nor even sign his name; by two others of the absent witnesses, that he was merely a hired hand in the employ of Jeff Cravey, and had no interest and claimed no interest in the

horses; and by another witness, that he, the witness, and not the defendant, sold the mare described in the indictment to Jeff Cravey, in Menard county, and executed to Jeff Cravey the bill of sale thereto, and that this defendant had no connection with that transaction.

The motion for new trial raised the question discussed in the opinion.

No brief for the appellant has reached the Reporters.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   It was proved on the trial by the State that about the same time that Fondren's mare, the animal named in the indictment, was stolen, other horses were stolen from the same neighborhood, and that these other horses were recovered by the owners at the same time and place that Fondren recovered his mare.   This evidence required from the court a charge to the jury explaining and limiting the purpose for which it was admitted, and the court, hav'ng omitted to give such charge, committed error for which the judgment must be reversed. (Wheeler v. The State, ante, 598.)

It was error for the court to instruct the jury as it did in relation to explanations and declarations made by defendant in relation to his possession, etc., of the alleged stolen animal.   There was no evidence to warrant such instruction.   No such declarations or explanations were in evidence, and a charge should be confined to the facts in evidence.   (Boddy v. The State, 14 Texas Ct. App., 528.)

Considering defendant's application for continuance in connection with his motion for new trial, we think the court should have granted a new trial.   The evidence of the absent witnesses, as set forth in the application for continuance, would certainly be material to the defendant, and, in view of the evidence adduced on the trial, it appears to us probably true.   Reasonable diligence on the part of the defendant to obtain the testimony of said witnesses is shown in the application for continuance.

Because of the errors mentioned, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*